UNITED STATES of America, Appellant,

v.

Pete JOHNSON, F. Douglas Mavor, Jane Kendle Mavor, Nelson T. Bruce, and Cleo Bruce, Appellees.

No. 15737.

United States Court of Appeals Ninth Circuit.

July 7, 1958.

Charles K. Rice, Asst. Atty. Gen., Marvin W. Weinstein, Robert N. Anderson, Lee A. Jackson, Attorneys, Department of Justice, Washington, D. C., Charles P. Moriarty, U. S. Atty., Seattle, Wash., for appellant.

Wright, Innis, Simon & Todd, Arthur E. Simon, Seattle, Wash., for appellees.

Before POPE, BARNES, and HAMLEY, Circuit Judges.

HAMLEY, Circuit Judge.

This action was brought to recover tax deficiencies, assessed and paid, for the year 1948. Judgment was entered for plaintiffs, and the Government appeals.

The single question presented here is whether, in exercising their right to cut certain timber, the taxpayers were cutting timber "for sale," within the meaning of § 117(k) (1) of the Internal Revenue Code of 1939, 26 U.S.C.A. (1939), § 117(k) (1). If so, as all concede, taxpayers were entitled to capital gains treatment on the proceeds received from such disposition of the logs. The trial court held that the taxpayers were cutting the timber "for sale." [1]

The facts are not in dispute. Pete Johnson, F. Douglas Mavor, and Nelson T. Bruce (taxpayers) are partners in the Johnson & Mavor Logging Company.[2] On July 23, 1946, the partnership entered into a written contract with Puget Sound Pulp & Timber Co., relating to the timber on part of the timber company's extensive holdings in Skagit county, Washington. Under this contract, the partnership was granted the right and license to enter upon the described lands and remove all merchantable timber, under the terms and conditions specified in the agreement.

The partnership agreed to pay the timber company stumpage payments for all timber cut, in accordance with a schedule set out in the contract. It was recited, however, that these stumpage prices were based on OPA ceiling prices then in effect. A formula was stated whereby the partnership would pay increased stumpage rates if the market price of logs should be increased during the con-

---

1. The applicable part of the statute in question reads as follows:

"(k) (1) If the taxpayer so elects upon his return for a taxable year, the cutting of timber (for sale or for use in the taxpayer's trade or business) during such year by the taxpayer who owns, or has a contract right to cut, such timber (providing he has owned such timber or has held such contract right for a period of more than six months prior to the beginning of such year) shall be considered as a sale or exchange of such timber cut during such year * *."

It is agreed by the parties that the taxpayers in this case had a right, under the contract, to cut the timber in question for a period of more than six months prior to the beginning of 1948, and that the timber was cut during 1948. It is also agreed that they did not cut the timber for use in the taxpayers' trade or business. The only question, then, is whether they cut such timber "for sale." If so, the statute permits them to consider the proceeds as a sale or exchange of such timber.

2. Appellees Jane Kendle Mavor and Cleo Bruce are the wives of F. Douglas Mavor and Nelson T. Bruce, respectively.

tract period. The timber company agreed to purchase from the partnership, "at current market prices," "all logs logged" by the partnership from the described lands. The partnership did not agree to sell all logs to the timber company, though in practice it did so.[3]

The contract referred to the timber company as "Owner," and to the partnership as "Logger." It provided that the agreement should be in effect until December 31, 1949, "by which time it is agreed the Logger shall log and deliver all timber from the lands described * * *."[4]

The formula set out in the contract with regard to stumpage prices gave the timber company the benefit of any rise in the market price of logs, after taking into account any increase in the partnership's direct labor cost. It did not protect the partnership with respect to stumpage prices in the event of a drop in the market price of logs, or in the event of an increase in direct labor costs where there was no increase in the market price of logs.[5]

Paragraph 11 of the contract provided that "all logs" should be branded with the brand or brands designated by the timber company before they left the land, "and all logs shall be scaled in Own-

er's name." Mavor testified, however, that, to the best of his knowledge, not all of the logs were branded with the timber company's name. "Some of them were branded, perhaps, with our own brand, our own log brand," he stated. The contract required the partnership to pay all taxes normally associated with logging. No reference was made in this instrument to real or personal property taxes, nor was there any testimony as to who paid them.[6]

It was provided in the contract that the partnership should keep all logs cut from the lands free of liens, encumbrances, and claims of any kind whatsoever arising from its logging operations, and should indemnify and save the timber company harmless therefrom. Under certain circumstances, the partnership was not required to carry on logging operations. One such circumstance was when, in the opinion of the timber company, the fire hazard should render such operations inadvisable.

The contract stipulated that the partnership was to act as an "independent contractor," and not as an agent of the timber company. Paragraph 14 of the contract contains a number of provisions concerning the manner in which operations were to be carried on, designed to protect the interests of the timber com-

---

3. During the negotiations which led to this contract, the timber company proposed the reverse of this arrangement— the timber company would have the option to buy the logs instead of the partnership having an option to sell the logs to the timber company. The partnership objected to the original proposal and, in the executed form of contract, it was the partnership which was given an option to sell to the timber company instead of vice versa. Under the contract, the partnership did agree to sell to the timber company all pulpwood cut and removed from the land. The proceeds realized from the cutting and disposition of pulpwood are not involved in this controversy.

4. Contrary to the Government's contention on appeal, the contract does not specify that all logs shall be delivered *to the timber company.* Paragraph 8 of the contract reads:

"All logs cut and removed by the Logger pursuant to this contract (other than pulpwood) shall be transported in trucks by Logger to Owner's Bay Creek boom or its Mt. Vernon boom on the Skagit River, and all logs purchased by the Owner shall be there delivered. The logs produced by the Logger may be mixed and rafted with other logs of the Owner."

5. Since there is no contract provision affording such protection to the partnership, it cannot be said, as contended by the Government, that "the risks of the market were borne by Puget Sound and the partnership was guaranteed a profit from its services."

6. Hence, there appears to be no support in the record for the Government's contention, on this appeal, that "property taxes upon the timber itself were apparently borne by Puget Sound."

pany.[7] An officer of the company testified that provisions of this kind are customarily included in contracts where timber is being removed and paid for on a time basis. Certain provisions concerning the forfeiture and termination of the contract ran in favor of the timber company. It was specifically provided that the partnership's rights were not transferable or assignable without the written permission of the timber company.

■ In determining whether, under the terms of this contract, the taxpayers cut the timber in question "for sale," within the meaning of § 117(k) (1), we look first to see whether the contract purported to give them the right to sell the logs.

The contract provided that the partnership shall "pay" to the timber company specified stumpage payments for timber cut, logged, and removed, and that the timber company agrees to "purchase" from the partnership all logs logged from the lands at current market "prices." The arrangement was therefore termed (as the Government concedes) as if it were contemplated that the partnership would acquire title to the logs as the timber was cut, and would thereafter sell them.[8]

More significant than the use of these specific terms, however, is the provision of the contract which gave the partnership the option to dispose of the logs to the timber company, but no obligation to do so. Since the partnership was not required to dispose of any or all of the logs to the timber company, it must have been contemplated that it could dispose of them to others. This could not have been done unless the partnership actually had title to the logs, and dispositions to others would necessarily be sales. It follows that, under the contract, the

---

7. Paragraph 14 of the contract reads:

"The Logger shall comply with the Washington State Forest Practices Act of 1945, and any amendments thereto, with reference to the leaving of the seed tree areas, the particular areas to be left to be designated by the Owner. All merchantable timber upon said lands shall be cut, logged, marketed, and the said timber tracts shall be logged clean as the work progresses. The timber shall not be high-graded nor shall isolated tracts be left or abandoned. The more easily logged tracts shall not be taken, leaving the more difficult tracts. All logging operations shall be conducted in a good, workmanlike manner and in accordance with the standard of the best logging practices obtaining under similar conditions in the State of Washington, and in the conduct thereof the Logger agrees to comply with and conform to all requirements of law now or hereafter enacted during the term of this contract relative to the operation, cutting, logging and removal of timber, or to fire or the prevention of fire, and all other laws relating to or affecting such logging operations, and the Logger expressly agrees to exercise reasonable degree of skill and care so as to minimize breakage.

"The Logger shall fell all snags required by law. The Logger shall, whenever the length of tree permits, cut all pulp specie timber into log lengths of forty (40) feet with allowances for usual trim. Where timber does not permit the cutting of a forty-foot log, logs of lesser length may be cut. The Logger is to be vested with a sound discretion as to whether full length logs, as provided for herein, can be cut from a given tree. All merchantable timber on said lands shall be cut and logged down to ten (10) inches minimum top diameter, on smooth tops."

8. This alone is sufficient to distinguish this case from Carlen v. Commissioner of Internal Revenue, 9 Cir., 220 F.2d 338, and Ellison v. Frank, 9 Cir., 245 F.2d 837, relied upon by the Government. The contracts involved in those cases did not purport to give the logger title to the logs as cut, or provide for the "sale" of such logs to the timber company or anyone else. In the Carlen case, the logs were to be delivered to mills designated by the timber company "and absolute title and control of all logs, until sold and paid for, shall rest in the First Party [timber company]." See Carlen v. Commissioner of Internal Revenue, 20 T.C. 573, 574. The only "sale" of logs was to be by the timber company, after which the logger would receive for its "service" the net cash returns less specified stumpage charges. In the Ellison case (245 F.2d at page 839), we agreed with the view of the trial court that, "under no circumstances whatever is Ellison to become the owner of the logs or to have any right, title or interest therein."

partnership acquired title to the logs, and all dispositions of such logs, to the timber company or to others, must have been sales.

In contending otherwise, the Government points to certain features of the contract which are usually associated only with logging service contracts. Principal among these were the provisions requiring the logs to be branded and scaled in the name of the timber company, and providing that they should be kept free of liens, encumbrances, and claims. We recognize the inconsistency between such provisions and an arrangement giving the partnership title to the logs. Yet they are provisions of a relatively minor nature, and, in our view, hardly override the more basic provisions referred to above. The probable explanation for the presence of these inconsistent provisions in the contract is that they were inadvertently retained after the option originally given to the timber company to buy all logs was converted into a reverse option in favor of the partnership.

The Government also makes reference to the provisions of the contract which designated the parties as "Owner" and "Logger," and the latter as an "independent contractor"; required the partnership to pay all taxes normally associated with logging; relieved the partnership of the duty to log when the timber company advised of a fire hazard; related to logging practices and safety measures; gave the timber company certain forfeiture and termination rights; and prohibited transfer or assignment of the partnership's rights without written permission.

While these provisions are commonly found in logging service contracts, they are not inappropriate in a contract for the sale of timber as cut by the purchaser. This is especially true where, as here, the timber company retains extensive timber holdings in the area. Some of these were so-called "boiler plate" provisions, such as are normally inserted as a matter of course in most contracts involving the cutting of timber. This is often done without too much thought being given to the question of whether such provisions are strictly necessary in view of the general tenor of the contractual arrangement.

Because of the presence of so many provisions of this kind, the trial court termed the contract "a masterpiece of circumlocution." That court nevertheless concluded that the basic purpose of the contract, and a purpose which was effectuated, was to give the partnership a contract right to cut timber for sale, within the meaning of § 117(k) (1). We agree.

Affirmed.