354

George W. GILMORE and Roberta
Gilmore
v.
UNITED STATES.
No. 454–57.

United States Court of Claims.
Feb. 3, 1960.

Charles P. Duffy, Portland, Or., for plaintiffs. Fred S. Gilbert, Jr., Washington, D. C., and Carl E. Davidson, Portland, Or., on the briefs.

Harold S. Larsen, Washington, D. C., with whom was Asst. Atty. Gen. Charles K. Rice, for defendant. James P. Garland and Lyle M. Turner, Washington, D. C., on the brief.

LARAMORE, Judge.

Plaintiffs in this action seek to recover income taxes in the amount of $142,740.75 for the years 1952, 1953, and 1954 on the theory that amounts received by them in these years for logging certain timber were capital gains rather than ordinary income.

The sole question presented is whether the plaintiffs are entitled to the benefits of the capital gains provisions of section 117(k) (1) of the Internal Revenue Code of 1939, 26 U.S.C. § 117 (1952 Ed.), and section 631(a) of the Internal Revenue Code of 1954, 26 U.S.C. § 631 (1952 Ed.) Supp. II.

Section 117(k) (1) of the 1939 Code, which is almost identical to section 631 (a) of the 1954 Code, reads in pertinent part as follows:

"If the taxpayer so elects upon his return for a taxable year, the cutting of timber (for sale or for use in the taxpayer's trade or business) during such year by the taxpayer who owns, or has a contract right to cut, such timber (providing he has owned such timber or has held such contract right for a period of more than six months prior to the beginning of such year) shall be considered as a sale or exchange of such timber cut during such year. In case such election has been made, gain or loss to the taxpayer shall be recognized in an amount equal to the difference between the adjusted basis for depletion of such timber in the hands of the taxpayer and the fair market value of such timber. Such fair market value shall be the fair market value as of the first day of the taxable year in which such timber is cut, and shall thereafter be considered as the cost of such cut timber to the taxpayer for all purposes for which such cost is a necessary factor."

The facts are these: During the years 1952, 1953, and 1954, plaintiffs George W. Gilmore and Roberta Gilmore, husband and wife, resided in the State of Oregon and filed joint Federal income tax returns for each of said years with the District Director of Internal Revenue for the District of Oregon.

Beginning in the year 1948 and continuing through the year 1954 and thereafter, plaintiffs were engaged as equal partners in the conduct of a general logging business and in the buying and selling of timber and logs in the vicinity of Molalla, Oregon, under the assumed business name of Gilmore Logging Company, a partnership (hereinafter referred to as Gilmore). The books of this partnership were and are maintained and its returns filed on a cash basis.

On May 20, 1942, and at all pertinent times involved in this case, certain timberlands were owned by Ostrander Railway and Timber Company (hereinafter referred to as Ostrander). On said date Ostrander entered into a written contract with Pope & Talbot, Inc., a California corporation. By the terms of said contract, Ostrander agreed as "Seller" to sell, and Pope & Talbot as "Purchaser" agreed to purchase all of the merchantable timber on the pertinent timberlands owned by Ostrander Railway and Timber Company. By the terms of said contract, hereinafter referred to as the Ostrander contract, Pope & Talbot had the right to enter upon the lands and proceed with logging of the timber. Pope & Talbot had the further right to construct and maintain the necessary roadways, structures and camps and to do any and all other things necessary and proper in their judgment for the logging of the lands and the cutting and removal of timber thereon and therefrom. The timber was to be scaled and graded by the Columbia River Log Scaling & Grading Bureau.

Pope & Talbot agreed to pay Ostrander specified "base stumpage prices" according to various grades and species and in addition an "overage stumpage price" whenever the average market price exceeded the specified base prices.

The contract provided generally that operations be carried on in a good and workmanlike manner. Pope & Talbot agreed to construct a truck road on a right-of-way to be furnished by Ostrander. Pope & Talbot otherwise reserved the right to construct additional roads and to use existing roads on the lands. In addition, Pope & Talbot agreed to pay for the use of a certain existing road at the rate of $1.10 per thousand feet log scale for all logs transported over the road.

Ostrander agreed to make its log dumps and booming and rafting facilities at Canby, Oregon, available to Pope & Talbot at a reasonable cost.

Prior to 1950, Pope & Talbot performed the logging operations on the timber lands, but at that time concluded that these operations were not economically profitable. Consequently, Pope & Talbot negotiated with several logging compa-

nies, including plaintiff, in connection with cutting said timber.

On July 17, 1950, plaintiff George W. Gilmore, on behalf of Gilmore Logging Company (hereinafter referred to as Gilmore), entered into a written contract with Pope & Talbot, by the terms of which Gilmore agreed to enter upon the timberlands covered by the Ostrander contract, and to provide all necessary men and logging and other equipment and to carry on the logging of the timberlands until all of the merchantable timber had been removed from the lands.

This contract, hereinafter referred to as the Gilmore contract, recited that Pope & Talbot had entered into the Ostrander contract with the Ostrander company, and that Pope & Talbot had thereby obtained the right to log and remove timber from the Ostrander timberlands, and then recited that Pope & Talbot was desirous of having Gilmore log and remove all of the remaining portions of the timber, and that Gilmore was desirous of performing all of such work. It was provided that Gilmore pay to Pope & Talbot the exact stumpage payments as agreed upon between Pope & Talbot and Ostrander in the Ostrander contract, and the same schedule of stumpage payments was set forth. In addition, Gilmore was required to pay to Pope & Talbot overage stumpage prices, defined and computed in the Gilmore contract identically as they were in the Ostrander contract.

By the terms of the Gilmore contract, Pope & Talbot agreed that the amount to be paid Gilmore "for all logs boomed and rafted and ready for towing, delivered at the Canby, Oregon, log dump shall be the market price at the time of delivery in the Columbia River District as agreed upon between the Contractor [Gilmore] and the Company [Pope & Talbot], based on water scale, and based on species and grades of logs by rafts." The market price was to be agreed upon by the parties by the same procedures as were provided between Pope & Talbot and Ostrander in the Ostrander contract.

The Gilmore contract contained the same provisions as the Ostrander contract regarding grading and scaling of the logs removed from the timberlands, except that in effect Gilmore assumed Pope & Talbot's obligation to pay one-half of the cost of such scaling and grading.

In effect, Gilmore agreed to pay to Pope & Talbot the same stumpage prices, overage stumpage prices, and scaling and grading costs as Pope & Talbot had agreed to pay to Ostrander.

By the Gilmore contract, Gilmore agreed to pay Pope & Talbot $2.30 per thousand feet for all logs transported over and across roads constructed by Pope & Talbot on the timberlands until the sum of $161,906.82 had been paid. That sum was stated to be the depreciated investment of Pope & Talbot in these roads as of December 31, 1949. Gilmore otherwise agreed to assume all of the obligations previously incurred by Pope & Talbot with respect to use and maintenance of roads located on the timberlands, or furnishing access thereto.

Shortly after the execution of the principal agreement between them, Gilmore also contracted to purchase from Pope & Talbot certain logging trucks, tractors and other equipment for the sum of $76,-150, and also miscellaneous logging supplies for an additional $14,913.13. This equipment and these supplies were on the pertinent timberlands and had been used by Pope & Talbot on its logging operations under the Ostrander contract.

Commencing in the year 1950 and continuing through 1954 and thereafter, Gilmore conducted logging operations on the timberlands pursuant to the Gilmore contract.

By the Ostrander contract Pope & Talbot was required to make a down payment to Ostrander in the amount of $100,000, to be held by Ostrander and applied as payment for the last of the timber to be cut and removed from the timberlands by Pope & Talbot. Under the Gilmore contract, Gilmore was not required to make any down payment.

In the Ostrander contract, because of war conditions, it was stated that Pope & Talbot were not obligated to remove any specific quantity of timber in any one calendar year. Pope & Talbot were required in the event it was able to conduct the logging operations for as much as six months in a calendar year, to pay to Ostrander not less than $75,000 in such year regardless of the amount of footage actually removed. If Pope & Talbot could not log for as much as six months, it was nevertheless required to pay Ostrander not less than $15,000 to apply upon the purchase price, even though no logging operations were conducted during that year. Under the Gilmore contract, Gilmore was required to log, transport and deliver to the log dump not less than 10,000,000 feet of logs by December 31, 1950, and not less than 20,000,000 nor more than 30,000,000 feet during each calendar year thereafter, unless otherwise agreed. The minimum production was not requested by Pope & Talbot nor maintained by Gilmore.

Pursuant to the Gilmore contract, Pope & Talbot had the right to order Gilmore's logging operations on the pertinent timberlands to cease in the event unfavorable market conditions precluded Pope & Talbot from utilizing the logs produced by Gilmore. In this event Gilmore had the right to clean up felled and bucked timber, and Pope & Talbot had first option to purchase such timber. No such shutdowns were requested or ordered by Pope & Talbot.

Pursuant to the Ostrander contract, Pope & Talbot agreed to pay all costs and expenses involved in the logging operations, except taxes, which were to be paid by Ostrander. These same obligations of Pope & Talbot were assumed by Gilmore. Gilmore also assumed the responsibility of reporting and paying the Oregon State Forest Research Tax.

The Gilmore contract provided for supervision at all times by Pope & Talbot. However, Pope & Talbot did not, in fact, supervise said operations except to the extent that in 1950 and 1951 its forester designated the areas of timber to be cut by Gilmore. Both the Ostrander and Gilmore contracts required that timber be branded. The branding irons used by Gilmore were furnished by Ostrander to Pope & Talbot, and in turn by Pope & Talbot to Gilmore.

By the terms of the Gilmore contract, Gilmore agreed to indemnify and save Pope & Talbot harmless from any and all losses on account of any injuries, deaths, or damages to persons or property caused by the negligence of Gilmore or its employees. Gilmore was also to provide its own insurance.

In the event Gilmore failed to carry out the terms of the agreement, Pope & Talbot was given the right to take over and complete the logging operation and could use Gilmore's equipment for such purposes.

Gilmore could not assign or transfer any of the rights under the agreement without written consent of Pope & Talbot.

Gilmore could subcontract the work only to subcontractors meeting the approval of Pope & Talbot.

The Ostrander contract provided that neither party could assign the contract without the written consent of the other. This was not obtained by Pope & Talbot, but Pope & Talbot did advise the executive officer of Ostrander that Gilmore was replacing the logging operations of Pope & Talbot.

In each of the calendar years here involved, the Gilmore Logging Company filed a partnership return wherein the cutting of the timber during each year was reported under the provisions of section 117(k) (1) of the Internal Revenue Code of 1939, and for the year 1954 under the provisions of section 631(a) of the Internal Revenue Code of 1954.

By a report of an examination and audit dated November 21, 1955, the District Director of Internal Revenue for the District of Oregon proposed to disallow to plaintiffs the benefits of section 117(k) (1) for the years 1952 and 1953 and section 631(a) for the year 1954. Accordingly, a deficiency was assessed

and paid by plaintiff. Plaintiff then filed a claim for refund which was disallowed. This suit results.

■ In determining whether under the terms of the contract the taxpayers cut the timber in question "for sale or for use in the taxpayer's trade or business" within the meaning of section 117 (k) (1), and section 631(a), we must look to see whether the contract gave Gilmore the right to sell the logs or use same in its trade or business. Absent that contractual right, the cases of Carlen v. Commissioner, 9 Cir., 220 F.2d 338 and Ellison v. Frank, 9 Cir., 245 F.2d 837 are directly in point. Based on the reasoning of those cases, we are of the opinion that the taxpayer must have acquired some property right in the logs as cut which would entitle it to capital gains treatment. On the other hand, if the taxpayer cut the timber in question "for sale" it had such a property right as would entitle it to the capital gains treatment contended for. In this situation the reasoning, with which we agree, of the court in the case of United States v. Johnson, 9 Cir., 257 F.2d 530 would apply.

Taxpayer here argues that its contract basically is the same as the contract in the Johnson case, supra, and hence since it had sold the logs to Pope & Talbot, it was entitled to the capital gains treatment provided for.

■ Defendant argues that the taxpayer never obtained an interest in the logs such as to afford it capital gains treatment. The defendant further says that all plaintiffs had was a contract right to cut timber for which they would receive compensation, and that plaintiffs were not owners of the timber cut and had no right either to sell it or to use it in their trade or business.

The answer to this vital question is by no means an easy one, nor is it, in our opinion, an insurmountable one.

From the contract it is apparent that only in the event of a stoppage of operations because of unfavorable market conditions could Gilmore sell to others. The contract in this respect provided that Gilmore had the right to clean up felled timber and Pope & Talbot had first option to purchase. Since Pope & Talbot had first option to purchase, we must assume that in the event they failed to exercise said option Gilmore could sell to whomever it pleased. However, this in our opinion is not enough to convince us that Gilmore was the owner with the right to sell all other timber.

Therefore, to learn the true intent of the contracting parties, we must look to the contract and its terms. The contract in question here contains no direct provision permitting Gilmore to sell to persons of its own choice. Nor does the contract expressly forbid such a sale. Since the contract did not expressly forbid such a sale, we conclude that Gilmore, although it had a contractual obligation to deliver the logs to the Canby Log Dump, could have disposed of the logs to an outside purchaser. What effect this would have on the relations between Gilmore and Pope & Talbot is not here involved.

It is true that Gilmore did not sell nor attempt to sell logs to anyone other than Pope & Talbot. However, there was no necessity for Gilmore to look for another purchaser. All Gilmore could get for the logs cut was the market price and Pope & Talbot were willing and anxious to, and, in fact, did take all logs cut and delivered by Gilmore.

Looking further to the contract and evidence in this case, we find these pertinent facts: As found in finding 6, "By the terms of the Gilmore contract, Pope & Talbot agreed that the amount to be paid Gilmore 'for all logs * * * shall be the market price * * *.'" (Emphasis supplied.)

Finding 8 also disclosed "Pope & Talbot was paying the same prices for logs from other sources as they were paying to Gilmore, * * *." In the same finding, "Gilmore did not sell nor attempt to sell logs to anyone other than Pope & Talbot." (Emphasis supplied.) The Gilmore contract further provided that Gilmore pay to Pope & Talbot stumpage payments and overage stumpage prices.

In this respect, clause 4 of the contract specifically provides "the stumpage prices to be paid by the contractor to the company for all timber cut * * * which shall be deducted from the payments due the contractor for all logs *purchased by the company from the contractor* * * *." (Emphasis supplied.)

Moreover, clause 5 of the contract refers to plaintiffs as the "Purchaser." This it seems to us conclusively shows the intent of the parties that plaintiffs were the owners and sellers of the logs to Pope & Talbot.

Thus, from a study of the contract in question and the facts in this case, it is obvious that Pope & Talbot, who used logs in its business, found that logging operations under its contract with Ostrander were not economically profitable. It therefore contracted with Gilmore to produce on almost the same terms as set forth in the Ostrander contract. In other words, Pope & Talbot wanted the logs, and also was desirous of saving a loss on the road construction. Therefore it (Pope & Talbot) contracted with plaintiffs to cut, pay for transportation over roads constructed by it, deliver and sell to them the logs cut. Under these circumstances Gilmore in effect stepped into the shoes of Pope & Talbot under its contract with Ostrander.

All the above leads us to the conclusion that Gilmore had a contract right to cut[1] and Pope & Talbot agreed to pay Gilmore for the logs as cut. This it seems to us connotes Gilmore's ownership of the logs cut and all disposition of such logs to Pope & Talbot must have been sales.

The contract contains many provisions similar to those present in the contract involved in the Johnson case, supra. We agree with the reasoning of the Court of Appeals in its disposition of this feature and adopt its reasoning in its application to the instant case.

In conclusion, we hold that plaintiffs had a contract right to cut timber for sale, within the meaning of section 117 (k) (1) and section 631(a).

Accordingly, plaintiffs are entitled to recover, and judgment will be entered to that effect. The amount of such recovery will be determined pursuant to Rule 38 (c) of the Rules of this court, 28 U.S.C.

It is so ordered.

BARKSDALE, District Judge, sitting by designation, and MADDEN, Judge, concur.

WHITAKER, Judge (dissenting.)

I think that under the contract Gilmore merely agreed to cut the timber on the Ostrander lands for Pope & Talbot for use in their mill. He did not have the right to cut it for resale to anyone to whom he wished to sell it. This is evidenced by the fact that Pope & Talbot could order him to suspend operations whenever they thought market conditions unfavorable. This is inconsistent with his claim of ownership of the timber.

There is nothing in the contract giving Gilmore the right to sell the logs to whomever he pleased, except the provision as to timber already cut when Pope & Talbot directed a suspension of operations. This was but an insignificant part of the total amount cut, and, even as to this, Pope & Talbot had the first refusal. Gilmore did not acquire ownership of it until Pope & Talbot surrendered their rights in it. The fact that the contract gave them the right to sell this timber to people other than Pope & Talbot, and did not give them this right as to other timber, indicates that it was not intended to grant this right as to the vast majority of the timber Gilmore cut. Plaintiff Gilmore had to deliver the logs to Pope & Talbot; he could sell to no one else. Had he owned the logs, he could have sold to whom he pleased.

---

1. This is especially true inasmuch as the defendant in its answer has admitted the allegation of paragraph 4 of the petition which alleges as follows:

"On July 17, 1950, George W. Gilmore, on behalf of said partnership, entered into a written agreement with Pope & Talbot, Inc., a California corporation, by the terms of which it then became the holder of a contract right to cut certain timber in Clackamas County, Oregon. * * *"

Pope & Talbot acquired ownership of the timber under their contract with Ostrander. Had they desired to transfer ownership to Gilmore, this could have been done most readily by an assignment of their contract with Ostrander, but this could be done only with Ostrander's consent. That they did not assign it is some indication they did not mean to transfer ownership.

The mere fact that the contract refers to the transfer of the logs from plaintiff to Pope & Talbot as a "sale" is not controlling. It has long been settled that words of a contract alone are not conclusive in determining tax consequences imposed by statute. Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731.

JONES, Chief Judge, joins in the foregoing dissenting opinion.