Stanley Shaffer and Frances Shaffer, Husband and Wife v. Commissioner. George Lindsey and Tilda Lindsey, Husband and Wife v. Commissioner.
Shaffer v. Commissioner
Docket Nos. 78708, 78765.
United States Tax Court
T.C. Memo 1960-186; 1960 Tax Ct. Memo LEXIS 103; 19 T.C.M. (CCH) 978; T.C.M. (RIA) 60186; September 12, 1960
*103 Petitioners were engaged in the business of purchasing and cutting timber, manufacturing lumber products, and selling logs and lumber products to others. Held, under certain contracts executed by petitioners and the owner of timberland, they acquired the right to cut timber for sale on their own account and for use in their trade or business within the meaning of section 631(a), I.R.C. 1954, and section 117(k)(1), I.R.C. 1939, and therefore were entitled to report the gain arising from the sale of logs and lumber as capital gain. George E. Link, Esq., 111 Sutter Street, San Francisco, Calif., for the petitioners. Donald G. Daiker, Esq., and Aaron S. Resnik, Esq., for the respondent. WITHEY *104 Memorandum Findings of Fact and Opinion WITHEY, Judge: Respondent determined deficiencies in the income taxes of the petitioners for the years and in the amounts as follows: Docket
No.
Petitioner
Year
Deficiency
78708
Stanley Shaffer and
1953
$ 1,242.05
Frances Shaffer
1954
7,832.51
1955
14,951.31
78765
George Lindsey and
1953
1,250.62
Tilda Lindsey
1954
6,837.27
1955
14,549.38
The sole issue presented for our decision is the correctness of the respondent's action in determining that petitioners did not have a contract right to cut timber from a tract of land for sale or for use in their trade or business within the meaning of section 117(k)(1) of the Internal Revenue Code of 1939 and section 631(a) of the Internal Revenue Code of 1954. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners Stanley and Frances Shaffer and George and Tilda Lindsey are husbands and wives, respectively, residing in Fortuna, California. They filed joint returns for the years here involved with the director at San Francisco, California. Petitioners Stanley Shaffer and *105 George Lindsey, together with M. F. McLean, are partners engaged in business under the name of Lindsey Lumber Company (sometimes hereinafter referred to as the partnership or Lindsey) and were so engaged as partners during the years here involved. The partnership has been active since its formation on June 9, 1948, in the business of purchasing and cutting timber, manufacturing lumber and lumber products in its sawmills, and selling logs and lumber products to others. In connection with its logging and lumber manufacturing operations the partnership acquired sawmills and some redwood mills. By January 1, 1952 it had invested approximately $85,000 in such facilities and equipment. In addition, the partnership invested $35,000 during 1952 for a permanent planing mill and constructed a permanent sawmill at a cost of $70,000 in 1955. During 1953, 1954, and 1955, the partnership employed an average of 100 persons in connection with its logging and manufacturing operations. In order to effect the sales of its lumber products, the partnership, commencing in 1948, entered into an arrangement with Fairhurst Lumber Co. of California (sometimes hereinafter referred to as Fairhurst) whereby *106 Fairhurst acted as sales agent for the partnership. Fairhurst then was, and has since continued to be, a wholesaler of lumber and lumber products, the activity of which is the purchasing of such products from sawmills and selling them. In 1950 the partnership, seeking to acquire additional timber, became interested in a tract of timber, consisting of approximately 8,000 acres and containing an estimated 100 million board feet. This particular tract (hereinafter referred to as the McCann tract) was owned by California Eastern Timber Co. (sometimes hereinafter referred to as Eastern). Eastern was, and has continued to be, engaged in the business of buying, holding, and selling timber and timberlands. It does not conduct logging or milling activities, but restricts its business to the acquisition, possession, and sale of growing timber. The outstanding capital stock of California Eastern Timber Co. and Fairhurst Lumber Co. was owned during the years here involved by the following individuals in the percentages indicated: California
Eastern
Fairhurst
Timber Co.
Lumber Co.
Jack Fairhurst
33 1/3%
33%
C. J. Fairhurst
33 1/3%
17%
A. W. Fairhurst
33 1/3%
50%
*107 C. J. Fairhurst and A. W. Fairhurst are brothers; Jack Fairhurst is the son of C. J. Fairhurst. The McCann tract was attractive to the partnership because it could be acquired without a large initial cash investment and because it was located close to a main line railroad. On October 1, 1950, the partnership entered into a written contract under which it purchased all of the standing and down merchantable fir timber located on the McCann tract. Because of the partnership's satisfactory and profitable relationship with Fairhurst, which since 1948 had been purchasing practically all of its lumber products, Fairhurst was also made a party to the timber contract. The pertinent provisions of the contract are as follows: THIS AGREEMENT, Made this 1st day of October, 1950 between CALIFORNIA EASTERN TIMBER CO., a California corporation the FIRST PARTY and M. F. McLean, S. J. Shaffer and George Lindsay a partnership d/b/a LINDSAY LUMBER COMPANY the SECOND PARTY, and FAIRHURST LUMBER CO. OF CALIFORNIA a California Corporation, THIRD PARTY, WITNESSETH: 1. For and in consideration of one dollar paid by the Second Party to the First Party, receipt of which is hereby acknowledged, and in *108 further consideration of services to be rendered as hereinafter provided by the Third Party to both the First Party and to the Second Party, the value of which is hereby acknowledged by the First Party and the Second Party, the First Party hereby agrees to sell and the Second Party hereby agrees to purchase, all of the standing and down merchantable fir timber on the following described lands in Humboldt County, State of California, to-wit: (as attached) 2. Said Second Party shall pay to the First Party a sum equal to 8 1/2% of the gross sale price of product manufactured but not less than $4.00 per thousand feet, except as provided in paragraph nine hereof, for all ties and lumber cut at the mill of the Second Party based on the lumber scale. 3(a). The Second Party agrees that they will commence cutting lumber at the above described mill not later than Dec. 1, 1950; that they will take the timber clean as they go and will cut the same with a minimum of waste, cutting all logs and trees thereon that can be manufactured into salable lumber so that after they shall have finished operations nothing shall remain which can be manufactured into salable lumber; that they shall not remove *109 any larger slabs than is customary by first class manufacturers of salable lumber; that any logs which cannot profitably be cut at Second Party's Mill above described need not be cut into lumber on the premises but may be removed, with the written consent of the Third Party, sold and accounted for as hereinafter set forth; that any trees which contain excessive pitch or other defects which render them useless for the manufacture of salable lumber, in the judgment of the First Party and the Third Party, are to be left standing upon the ground; should, however, the Second Party wish to remove these bad trees by making forest wood of them, they shall pay to the First Party through the Third Party 50" per cord of 128 cubic feet, which payment shall be made before the wood is removed from said premises. Second Party shall burn all wood refuse and waste, including tops and limbs, in such manner and at such times as will not injure the adjoining timber and they shall at all times during the logging operations take every necessary precaution to prevent the spreading of fire and shall comply with all the provisions of the State Law on forest protection, and assume all responsibility under said *110 law for the spread of fire. 3(b). To guarantee faithful compliance by the Second Party with the burning requirements aforesaid and also to guarantee full compliance with State and/or Federal laws prescribing certain practices with reference to the cutting and removal of timber, the leaving of reserve trees or seedlings and the protection of such residual stands and trees left uncut as a source of seed supply, from destruction by fire or unnecessary damage resulting from logging or milling operation in the above described timber, the Third Party shall deduct, in addition to any deductions for stumpage, from any monies otherwise due to the Second Party the sum of.25 Cents per thousand FBM until the total sum of $5,000.00 shall have been so deducted. These monies shall be held in a Trust Fund by the Third Party and shall be refunded to the Second Party provided he shall have promptly and in seasonable time complied with the requirements in paragraph 3(c) hereof and not otherwise. * * *
4. Second Party, whenever they shall have removed from any one of the tracts hereinbefore described, all timber and timber products, shall immediately surrender possession thereof to the Party *111 of the First Part and remove their equipment (and logging and/or trucking roads if requested so to do by the First Party) from such tract, unless the same shall be needed as right of way to reach the timber upon other tracts not yet logged. 5. Second Party shall pay all Social Security, Industrial Insurance and Workmen's Compensation premiums and assessments and all labor employed in the logging of said timber and the manufacture thereof, promptly, so that no liens can be filed against said timber or against any logs cut from the premises above described, and the First Party and the Third Party reserve the right in the event the Second Party shall fail to pay for such labor and material, to pay for the same and deduct the amount so paid from any sums due to the Second Party, but the First Party and the Third Party do not obligate themselves to pay such labor and material bills. All taxes levied and payable on land, timber and for fire patrol, on the property hereinbefore described, shall be for the account of the First Party. 6. Second Party assumes all risks of loss and damage to all lumber and timber products manufactured by them until the same are delivered to the purchaser. *112 The Second Party assumes all taxes levied against the manufactured product and against their mill and improvements. 7. Second Party agrees to cut a minimum of 1,500,000 feet board measure for and during each calendar month, weather conditions permitting, that this contract may be in force, and to enter upon said premises and cut and remove the timber in the following manner and not otherwise; they will first log that forty acre tract on which they first locate their mill and will not enter upon or trespass upon any other tracts of land until all the timber and forest products shall have been entirely cut and removed therefrom; and whenever Second Party has cut and removed all timber and timber products from the tract upon which they first entered and have otherwise complied with the terms of this contract to be performed by them, they may then enter upon an adjoining forty acre tract of the property above described and in like manner cut and remove the timber and forest products from said tract; and so continue upon one additional forty acre tract at a time until all of the said timber shall have been cut, removed and accounted for under the terms of this contract. 8. Second Party *113 shall sell all of their manufactured products through the Agency of the Third Party, and said Third Party agrees during the term of this contract to use its best efforts in disposing of all the salable products manufactured by the Second Party under this contract. Second Party grants to said Third Party full and exclusive sales agency and right of disposing of and marketing all of said Second Party's products, whatsoever be the nature thereof, and agrees with the Third Party and the First Party that they will not directly or indirectly, during said contract, sell or market or dispose of any of the salable lumber manufactured under this contract except through the agency of the Third Party. Second Party for the services rendered by the Third Party and in consideration of the Third Party assuming the sales agency, agrees to pay to the Third Party a sum equal to five per cent of the gross sales, exclusive of any discounts for cash, F.O.B. cars or F.A.S. vessel at the shipping point, of all products or materials sold by the Second Party, during the term of this contract, and whether such sale is made by the Third Party or through any other source, including sales made by the Second Party *114 for any price, it being understood that if any such products or materials or output of Second Party is taken by Second Party or by Third Party either in their own name or for their own account, this shall be allowed hereunder and deemed a sale, the same as if sold to a Fourth Party. Second Party agrees that if any lumber or forest products are sold by them with the consent of the Third Party the same shall be sold in the name of the Third Party, invoiced to the consignee by the Third Party, and the proceeds therefrom collected by the Third Party. 9. The Third Party agrees to use its best endeavor to sell all of said forest products at their fair market value existing at the time of the sale, and the Second Party agrees to honor all such sales made by the Third Party, and if the Second Party shall receive orders for materials they shall notify the Third Party thereof and the same shall be billed by the Third Party in its own name and collections made by it the same as though the orders had originated with the Third Party. Second Party agrees that if at any time they shall receive for any forest products a bid from any Fourth Party, or desire to sell to a Fourth Party, then before *115 making said sale or accepting said bid the Second Party shall give to the Third Party a five days' prior option in writing to take at such bid or sales price, it being the intention that the Third Party shall have the first right to sell all of the Second Party's output and in all cases shall be entitled to its five per cent commission on all sales, to whomsoever and at whatsoever prices made. If any sales are made by the Second Party to fourth parties, except under the conditions set forth in this paragraph, then the rate of stumpage to be paid by the Second Party on such sales shall be $10.00 dollars instead of the rate specified in paragraph 2 hereof. All of the provisions of this paragraph and of paragraph 8 above shall remain in full force and effect until all of the timber described in paragraph one (1) hereof shall have been cut and removed. 10. The Third Party agrees and the Second Party consents that the Third Party shall remit to the First Party (as provided in par. 2), per thousand board feet, except as provided in paragraph 9 hereof, on all lumber sold and handled by the Third Party for the Second Party under the terms of this contract and for all logs taken from the *116 said premises by the Second Party, which logs shall be sold exclusively by and through the agency of the Third Party; that the said Third Party may at their option also pay from the proceeds of any sales made by or through it of the forest products taken from the above described premises, any sum which may be due to any parties from the Second Party upon its saw mill and machinery which it may be holding under conditional sale contract, so as to prevent a forfeiture of such contract; and the Third Party agrees to remit the balance collected by it to the said Second Party less said charges above mentioned and less its commission of five per cent, hereinbefore provided for. 11. Second Party shall fill all orders given or taken by the Third Party promptly and to the full cutting capacity of said mill at its highest delivery ability, and all products and materials shall be of first quality according to the grade ordered. * * *
14. The First Party shall have the right at its option to terminate this contract at any time when the Second Party shall fail to perform the conditions and terms hereof or whenever they shall be in default for the performance of any of said conditions and *117 upon such termination this contract shall become null and void and all payments on said timber, including all monies in the Trust Fund (Par. 3(b)), shall be and forever remain the absolute property of the First Party, to be retained as liquidated damages and not as penalty, it being expressly understood and agreed that time is of the essence of this contract. It is agreed between the First Party and the Third Party that, in the event the First Party exercises any of the rights in this paragraph above provided, the Third Party shall have a reasonable time and not less than ninety days, wherein to replace the mill and logging operation of the Second Party and having so replaced the operation, this contract will remain in full force and effect the same as if there had been no change in the identity of the Second Party and the First Party agrees to execute a new contract to the newly provided Second Party, the same in all terms and conditions as this contract save only the name of the Second Party. 15. Second Party agrees, that to secure the performance of this contract the mills shall not be removed from said lands until all the timber is cut and removed, and all monies due to the First *118 Party and Third Party shall have been paid, and in case the party of the Second Part shall fail to perform this contract, or to pay for timber cut thereon as provided herein, the Party of the First Part shall have the right, by itself or its agencies, to take possession of the said mill and use the same for the purpose of completing the cutting of the timber on said lands without further compensation to the owner. 16. Second Party shall not assign this contract or any interest therein without the written consent of the First Party and the Third Party. 17. All products manufactured under the terms of this contract and the logs shipped under the terms thereof, shall be and remain the property of the First Party until the payments herein provided to be made to it have been paid. On May 8, 1953, Lindsey, Eastern, and Fairhurst executed another timber contract relating to the McCann tract which was substantially identical to the contract executed October 1, 1950, except for some adjustment in the stumpage price. The partnership had the sole right to direct its operations with respect to the cutting of timber and manufacturing of lumber products from timber removed from the McCann *119 tract. It alone made the decisions as to what lumber products were to be produced from the cut timber. Such decisions were made by the partnership primarily on the basis of the price obtainable for such products. The normal procedure followed by the partnership in selling its lumber products was that it first would receive a purchase order from Fairhurst. If the price offered by Fairhurst for the lumber and lumber products was agreeable to the partnership, the purchase orders would be accepted. In the event that such purchase orders requested the delivery of lumber products not then being manufactured or in the event such orders offered a price unacceptable to the partnership, it would refuse to accept such purchase orders. On many occasions the partnership did in fact refuse to accept such purchase orders, and its right to so refuse was always recognized by Fairhurst. Although the partnership in fact sold all of its lumber and lumber products manufactured from timber cut from the McCann tract to Fairhurst during 1953, 1954, and 1955, it sold logs to any purchaser it selected without first offering to sell them to Fairhurst. The partnership from time to time carried in its inventory *120 logs and lumber products cut from timber removed from the McCann tract until such a time as they could be sold for a price higher than the prevailing market price. The partnership always determined the selling price of the lumber products manufactured by it without its decisions being questioned or disputed by either Eastern or Fairhurst. As a result of a flood which occurred in December 1955 the partnership incurred a loss in its inventory of approximately 500,000 board feet of lumber upon which it paid stumpage charges to Eastern with respect to the lumber so damaged or lost. During the years here involved approximately 45 per cent of the partnership's product came from timber cut from areas other than the McCann tract and from timber stands in which neither Fairhurst nor Eastern had any interest. Lindsey Lumber Co., during the years here in issue, possessed a contractual right to cut timber from the McCann tract under which it sold logs and lumber products on its own account and also used such lumber in its business of manufacturing lumber products. Opinion Sections 117(k)(1) of the 1939 Code [1] and 631(a) of the 1954 Code [2] provide for the optional treatment of gain *121 realized from the cutting and sale of timber as capital gain if the taxpayer either owns such timber or possesses a contract right to cut it for sale or for use in his trade or business. *122 The petitioners here contend that Lindsey Lumber Co. possessed a contract right to cut the timber on the McCann tract both for sale and for use in its business as a manufacturer of lumber products and a seller of logs and lumber products to others, and therefore is entitled to capital gain treatment of the proceeds of the logs and lumber disposed of during the years in issue. The respondent takes the position that the contracts here involved were merely "service" or employment contracts under which petitioners were required to perform logging services in removing timber from the McCann tract and that the partnership therefore did not acquire any interest in the timber as cut which it could dispose of by sale. The parties on brief are in essential agreement that the principles expressed in Helga Carlen, 20 T.C. 573, affd. 220 F. 2d 338, are controlling of the issue here presented. The respondent also contends that the Carlen case is factually in point. The petitioners, however, contend that the facts in the present record are sharply distinguishable from the situation involved in Helga Carlen, supra. In the Carlen case, the taxpayers *123 were members of a partnership engaged in logging and cutting timber. The partnership was not engaged in cutting timber for sale on its own account or for use in its business. A contract was executed in 1945 between taxpayers and the owners of certain tracts of timberland whereby the partnership agreed to log off specified types of merchantable timber. For this "service" (so described in the contract) the taxpayers were to receive an agreed amount, which was to be deducted from the ultimate selling price of the logs, upon their sale by the timber owner. The contract provided that the timber owner was to retain "absolute title and control of all logs" until their final disposition. We held in the Carlen case that a taxpayer must have not only the contractual right to cut the timber but also the right to sell it on his own account or to use it in his trade or business in order to claim the benefit of section 117(k)(1) of the 1939 Code. We sustained the Commissioner's construction of that section to the effect that it does not cover a taxpayer who cuts timber in which he does not himself possess a proprietary interest that he could dispose of by sale. Since the contractual arrangement *124 between the taxpayers and the timber owner there in issue did not even purport to show a sale of the timber as cut to the partnership or to create in the partners any proprietary interest in the timber either before or after cutting, and since the contract clearly contemplated that the taxpayers were simply employed as contractors to cut timber on the lands of another for compensation determined on the basis of the market price of the logs, we upheld the respondent's contention that they were not entitled to the benefits of section 117(k)(1). We agree with petitioners that the contractual relationship and the consistent course of conduct between Lindsey, Eastern and Fairhurst clearly distinguish this case from Helga Carlen, supra. The contracts here in question do not resemble the employmentype contract there involved. Petitioners are not referred to as "loggers," or otherwise shown to be merely employees or contractors hired to perform a service for compensation. The fact that under the contracts Eastern agreed to "sell" and the partnership agreed to "purchase" the timber, that petitioners assumed all risk of loss and damage to the cut timber and lumber products manufactured *125 by them and had the right to possession of such logs and lumber products, that the partnership was obligated to pay Eastern for the cut timber, that Lindsey agreed to "sell" its manufactured lumber products through the agency of Fairhurst, that the partnership had the right to sell to outsiders in the event Fairhurst failed to meet an offer in excess of its own, and that Lindsey sold its logs to outside purchasers of its own selection, all tend to establish that petitioners acquired title to the McCann tract timber as it was cut. Unlike the contracts involved here, which provide for title to cut timber to pass to Lindsey upon its payment of stumpage fees, the timber contract in Helga Carlen, supra, provided for the retention of title to and of all logs by the timber owner. A further point of distinction between the case at bar and the Carlen case is the fact that the taxpayers there did not use the cut timber in their trade or business. In Carlen, all of the timber was owned and used by parties other than the loggers. Consequently, respondent's contention that the record herein presents a situation identical to the facts in Helga Carlen, supra, is not *126 well founded. Our decision in Volney L. Pinkerton, 28 T.C. 910, and the decision of the Court of Appeals for the Ninth Circuit in United States v. Johnson, 257 F. 2d 530, closely parallel the situation here presented. Volney L. Pinkerton, supra, involved a partnership engaged in a general logging business consisting of the cutting of timber, marketing logs and lumber products, and purchasing and selling tracts of timberland. During the years there in issue, the taxpayers were engaged in logging timber and selling logs under a contract with a timber company. The contract referred to the timber company as "seller" and the taxpayers as "buyer." The partners were given the right to remove all merchantable timber and to sell the logs, provided they were sold "in the Puget Sound Log Market." They agreed to make stumpage payments for the timber on the basis of a percentage of the average gross sales price of the logs, to log the property clean, and to pay for all merchantable timber not logged, damaged, or destroyed by fire. The taxpayers continued to cut timber under this contract and to sell the timber removed from the timberland described therein *127 for a period of 10 years. All of the proceeds from the sale of logs cut by the partners from the land covered by the contract there in issue were retained by the partnership for its own account, and after the payment of operating expenses and stumpage the balance of the proceeds consistently was credited to the individual accounts of the partners. The taxpayers also made an agreement with a sawmill company which provided that the sawmill company was to have "first call," at going market prices, on all logs cut by the taxpayers under their timber contract. During the years involved the taxpayers in fact sold the major portion of their logs to the sawmill company. The Commissioner there contended that the taxpayers were not entitled to claim the benefits of section 117(k)(1) of the 1939 Code on the ground that they did not possess any proprietary interest in the logs as cut because they did not have the right to sell them on their own account. Applying the principle set forth in Helga Carlen, supra, we there held that the taxpayers did in fact have the right to sell the timber specified in the timber contract on their own account, stating at page 917: "Despite the *128 equivocal language used in some of the written instruments incident to the transactions involved we think that the tenor of the dealings between * * * Eagle Gorge [taxpayer], and Weyerhauser [timber owner] over almost a 10-year period is convincing evidence that Eagle Gorge had rights in the timber such as entitled the partnership to the benefits of section 117(k)(1). * * *" United States v. Johnson, supra, is also in point here. The taxpayers, as here and in Volney L. Pinkerton, supra, were partners in a logging company which had executed a written contract with an owner of timber, pursuant to which the partners had the right to remove all merchantable timber from the specified land. The partners agreed to pay stumpage for the timber removed in accordance with a schedule based in effect on the prevailing market prices of logs. The contract referred to the timber company as "Owner" and to the logging company (taxpayers) as "Logger." The timber company agreed to "purchase" from the partners at current market prices all of the logs removed by them from the described land. The taxpayers did not contract to sell all of the logs to the timber company, although *129 in practice they did so. The Court of Appeals for the Ninth Circuit denied the Commissioner's contention that the contract in question was a logging service contract which did not create in the taxpayers any proprietary interest in the timber. The court held that the arrangement there in question contemplated that the partners were to acquire title to the logs as the timber was cut and thereafter to sell them. The court also pointed out that since the partners were not required to dispose of any of the logs to the timber company, the parties must have contemplated that the logs could be sold to other purchasers, and this could not have been possible unless the taxpayers had acquired title to the logs. The Court of Appeals acknowledged that certain provisions in the timber contract are normally associated only with logging service contracts, but found that such provisions were of a relatively minor nature and could not override the fundamental intention of the parties as there expressed. We are of the opinion that the Pinkerton and Johnson cases are closely in point here and serve to clarify the essential difference between the arrangement shown by the record before us and the situation *130 presented in Helga Carlen, supra. In further support of his contention that the petitioners did not acquire under the timber contracts a proprietary interest in the timber which could be disposed of by sale, the respondent points to certain features of those contracts which, he contends, are inconsistent with the acquisition of such an interest. Paragraph 16 of the timber contracts prevents the petitioners from assigning the contracts without the written consent of Eastern and Fairhurst. This provision, the respondent insists, discloses an intention to be bound to a personal service contract because the work to be performed demanded skill on the part of the timber cutters and the nonassignment clause was an expression of Eastern's confidence in them. From an examination of the record, however, it is clear that the principal reason for the inclusion of such a nonassignment provision in the timber contracts was that it gave to Eastern the right to insist upon a favorable contract revision or a higher stumpage rate as the consideration for its consent to an assignment. In response to a question asked at the trial by counsel for respondent with respect to the reason for *131 the insertion of a nonassignment clause in such contracts, Jack Fairhurst, Executive Vice President and General Manager of Eastern, testified as follows: The principal reason is the inflationary trends that have affected timber; and usually if a contract is made today between two parties upon the terms and conditions similar to our contract between Perry Wheat and Whitlow, to protect the seller, the seller insists that a nonassignment be put in so that if the buyer is going to resell the contract and make some substantial gains, because of inflation in timber values, it gives the seller a chance to come in and say, "Yes, we will assign if you will pay us a little more money," and that usually has been the case. The respondent also points to paragraph 17 of the timber contracts which provides that title to the logs and lumber products cut from timber removed from the McCann tract is to remain in Eastern until petitioners have made the stumpage payments. It is true that the retention of title by the seller until payment has been received appears inconsistent with an outright sale of property. However, such provisions are very commonly inserted in sales contracts for security purposes *132 only. The record shows that such title retention provisions frequently appear in logging and timber contracts solely for security purposes. The testimony here discloses that the provision in the timber contracts for the retention of title by Eastern until the payment of stumpage was regarded as "boilerplate" by the parties and was included without any thought of depriving Lindsey of a property interest in the timber. The respondent also argues that certain provisions in the timber contracts relating to restrictions as to the method in which the timber should be removed constitute evidence that the petitioners were merely logging contractors and did not acquire any proprietary interest in the timber. These provisions are contained principally in paragraphs 3(a) through (e), 4, 5, 6, 15, and 17(a) through (e) and cover such matters as petitioners' obligation to log the property clean, with a minimum of waste, to comply with the fire regulations, to comply with certain practices prescribed by law for the protection of seedling trees, to surrender possession of the tracts after being logged, to refrain from hunting or using firearms on the timber property, to repair fences, gates, and *133 cattleguards and to protect grazing lands located on the McCann tract. We recognize that provisions similar to these commonly appear in contracts to perform logging services only, but we are unable to agree that they are inappropriate in a contract for the sale of timber to the timber cutter as cut. These provisions clearly serve to protect the interest of the landowner in preventing waste and insuring workmanlike logging practices. The respondent also calls to our attention the portion of paragraph 9 of the contract which grants Fairhurst a right of first refusal with respect to the lumber processed by the partnership and imposes upon petitioners a treble stumpage rate in the event of their failure to give Fairhurst 5 days' written notice before selling to another purchaser. If Fairhurst failed to meet a higher offer within 5 days after receiving written notice from Lindsey, the partnership was free to sell to a higher bidder. It is respondent's argument that this provision is inconsistent with a sale since in effect it enables Fairhurst to control all of the lumber cut and milled by Lindsey, thereby canceling its property interest in such lumber. Since the net effect of this provision *134 however is to enable the partnership to sell its manufactured lumber products to the highest bidder, and since the testimony shows that the sole reason for the insertion of this portion of paragraph 9 was for record-keeping purposes in connection with stumpage payments, that is, to prevent sales to other buyers without the knowledge of Fairhurst or Eastern, we are unable to agree with the respondent's contention on this point. The respondent further contends that since the capital stock of both Eastern and Fairhurst was owned solely by Jack Fairhurst, C. J. Fairhurst, and A. W. Fairhurst, the petitioners were deprived of any substantial proprietary interest in the timber because the Fairhurst family controlled both the source of the timber cut and milled by Lindsey and, by reason of holding a right of first refusal, its final disposition. Fairhurst, however, had no rights of refusal with respect to the logs sold by Lindsey, but only with respect to the lumber processed in its mill. In the light of United States v. Johnson, supra, it is immaterial that the timber owner is also the purchaser of the logs and lumber from the logging operator. In the Johnson case, the timber *135 owner agreed to purchase all of the logs removed from the specified tracts of land. The logging company (taxpayers) was not obligated to sell its logs to the owner of the land, but in fact it did so. As heretofore stated, the taxpayers there were found to have a contract right to cut timber under section 117(k)(1) of the 1939 Code. The recent cases of Gilmore v. United States, 180 F. Supp. 354; and Wirkkala v. United States, 181 F. Supp. 338, likewise confirm that a right of first refusal held by the timber owner does not adversely affect the logging operator's contract right to cut. Consequently, if the owner of the timber himself can control its disposition and still convey a proprietary interest in the logs, it does not appear that the possession of a right of first refusal by Fairhurst, which is a separate corporation from the owner of the timberland, militates against petitioners' property interest in the logs and lumber products even though Fairhurst and Eastern are owned by the same individuals. Although some of these contractual provisions are commonly associated with logging service contracts, they are not inconsistent with timber-sales contracts *136 and they are not of predominant importance in ascertaining the fundamental intention of the parties here. We are unable to accept the proposition that such provisions should be construed to override the expressed intention of the parties in several other provisions to which we have previously referred and which clearly evidence the transfer of incidents of ownership to the petitioners and the creation of a very substantial proprietary interest in the timber as cut. In addition to the provisions contained in the timber contracts which disclose the acquisition of a proprietary interest in the logs on the part of the petitioners, a business relationship and a course of conduct had developed between Eastern, Fairhurst, and the partnership that indicate the intention to convey a property interest in the timber by way of sale. The record clearly shows that the partnership alone decided what timber products would be manufactured in its sawmills and in what quantities, and determined the price at which such lumber products would be sold. If, as the result of negotiations with Fairhurst, petitioners did not agree as to the selling price or some other factor, they refused to sell to Fairhurst *137 on its terms. In view of the foregoing, it is our opinion that the record discloses a situation that is plainly distinguishable from the facts presented in Helga Carlen, supra, and the petitioners appear clearly to have acquired a proprietary interest in the timber because of their acquisition of the right to sell logs and lumber products on their own account. See also Gilmore v. United States, supra; Stone v. Granquist, - F. Supp. - (D.C.Ore., Dec. 17, 1959); Wirkkala v. United States, supra. In addition to the acquisition of a contract right to cut timber from the McCann tract for sale on their own account, petitioners also acquired the right to cut timber for use in their trade or business as a manufacturer of lumber products and a seller of logs and lumber to others. It is undisputed that the partnership had acquired sawmills, a planing mill, and other equipment which it was utilizing during the years in question in the processing of lumber. The timber stand on the McCann tract served as one but not the sole source of raw materials for use in Lindsey's business of manufacturing and selling finished lumber products. Consequently, even *138 if petitioners had not established the fact that they had acquired a contract right to cut timber from the McCann tract for sale on their own account under sections 117(k)(1) of the 1939 Code and 631(a) of the 1954 Code, they nevertheless have established the possession of a right to cut such timber for use in their business, within the meaning of those sections. The petitioners therefore are entitled to treat the gain realized from the sale of logs and lumber derived from timber removed from the McCann tract as long-term capital gain pursuant to sections 117(k)(1) of the 1939 Code and 631(a) of the 1954 Code. Decision will be entered under Rule 50. Footnotes
1. I.R.C. 1939. SEC. 117. CAPITAL GAINS AND LOSSES. * * *
(k) Gain or Loss in the Case of Timber or Coal. - (1) If the taxpayer so elects upon his return for a taxable year, the cutting of timber (for sale or for use in the taxpayer's trade or business) during such year by the taxpayer who owns, or has a contract right to cut, such timber (providing he has owned such timber or has held such contract right for a period of more than six months prior to the beginning of such year) shall be considered as a sale or exchange of such timber cut during such year * * * ↩
2. I.R.C. 1954. SEC. 631. GAIN OR LOSS IN THE CASE OF TIMBER OR COAL. (a) Election to Consider Cutting as Sale or Exchange. - If the taxpayer so elects on his return for a taxable year, the cutting of timber (for sale or for use in the taxpayer's trade or business) during such year by the taxpayer who owns, or has a contract right to cut, such timber (providing he has owned such timber or has held such contract right for a period of more than 6 months before the beginning of such year) shall be considered as a sale or exchange of such timber cut during such year. * * *↩