Dean Lansing and Virginia L. Barba, Formerly Known as Virginia Lansing v. Commissioner.
Lansing v. Commissioner
Docket No. 2013-62.
United States Tax Court
T.C. Memo 1964-82; 1964 Tax Ct. Memo LEXIS 253; 23 T.C.M. (CCH) 498; T.C.M. (RIA) 64082; March 30, 1964
*253 For the calendar years 1955, 1956, and 1957 petitioners reported certain conceded gains from three tracts of timber (Travers, Section 33, and Wilson) as long-term capital gain. The respondent determined that the gains were ordinary income. As to the Travers tract, it is held that petitioner Dean Lansing had contract rights to cut and the right to sell the timber cut under the contract on his own account for a period of more than 6 months before the beginning of each year and that petitioners are, therefore, entitled to the benefits of section 631(a), I.R.C. 1954. Volney L. Pinkerton, 28 T.C. 910, followed. As to the gains from the Section 33 and Wilson tracts, the respondent's determination is approved for lack of proof in Section 33, and disapproved in Wilson on the ground that on the basis of the record it appears we should leave the conceded gain as petitioners reported it, namely, as long-term capital gain. Maurice J. Hindin, *255 400 S. Beverly Dr., Beverly Hills, Calif., and Alvin D. McNeil, for the petitioners. Donald G. Daiker, for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: Respondent determined deficiencies in income tax for the calendar years 1955, 1956, and 1957 in the amounts of $69,271.62, $80,858.45, and $70,046.91, respectively, plus an addition to tax under section 6654, I.R.C. 1954, for 1955 of $1,089.84. The pleadings present a number of issues. Petitioners have agreed to all the adjustments except those relating to whether the gain from three tracts of timber (Travers, Section 33, and Wilson) is to be taxed as ordinary income or capital gain. Respondent has conceded that the statute of limitations bars assessment of any tax as against petitioner Virginia L. Barba for the year 1955. Some of the facts were stipulated. Findings of Fact The stipulated facts, together with the exhibits attached to the stipulation, are so found and are incorporated herein by this reference. During the calendar years 1955, 1956, and 1957, petitioners were husband and wife. They held joint Federal income tax returns for the calendar *256 years 1955, 1956, and 1957 with the district director of internal revenue at San Francisco, California. Re: Travers Tract On May 16, 1950, Raymond E. Travers and Juanita F. Travers, husband and wife, entered into an agreement with G. L. Speier Co. (referred to in the agreement as an individual) whereby G. L. Speier Co. acquired "the right to cut and remove all merchantable redwood and fir timber, standing, lying and being on that real property situate in the County of Humboldt, State of California, described as follows:" (said description includes the timber lands referred to in this proceeding as the Travers tract). On February 16, 1951, the Travers entered into an agreement with G. L. Speier. This agreement generally constituted a renewal, under substantially the same terms, of the agreement executed on May 16, 1950. On October 9, 1951, the Travers entered into an agreement with Speier. This agreement provided for the fixing of a definite sale price for certain burned and unburned timber on the property that was described in the two contracts between the same parties dated May 16, 1950, and February 16, 1951. On August 19, 1952, Speier entered into an agreement with Dean *257 Lansing, hereinafter sometimes referred to as petitioner or as Lansing. (In this agreement G. L. Speier Co. is referred to as a corporation.) This contract, in part, reads as follows: THIS AGREEMENT, Made this 19th day of August, 1952, by and between G. L. SPEIER, an individual, the party of the first part, and hereinafter referred to as Speier, and DEAN LANSING, an individual, the party of the second part, and hereinafter referred to as Lansing, WITNESSETH: WHEREAS Speier is purchasing certain merchantable timber from Raymond E. Travers and Juanita F. Travers, his wife, pursuant to a written agreement, dated May 16, 1950, as modified by Agreements dated February…, 1951 and…, 1951, and WHEREAS the parties hereto desire to provide for the logging of said timber by Lansing so as to insure an adequate supply of logs to sawmills in which Speier is interested, NOW, THEREFORE, IT IS AGREED as follows: 1. Speier hereby gives and grants to Lansing the exclusive right and privilege of entering upon those certain premises described in the aforesaid Travers agreements and to remove therefrom all merchantable redwood and fir timber, standing, lying and being thereon. Lansing agrees *258 to commence logging operations within a reasonable time and to perform directly or by subcontractor the entire logging operation, including the falling, bucking, peeling, yarding, loading and transporting of all merchantable redwood and fir logs developed thereby. 2. It is agreed that all sawmills logs, both redwood and fir, developed by Lansing shall be delivered by Lansing to G. L. Speier Co., a corporation, or to such other locations in the vicinity of Arcata, California as Speier may from time to time direct. All fir peeler logs shall be delivered by Lansing to Arcata Plywood Company, Arcata, California. 3. In consideration therefor, Speier agrees to pay to Lansing at the time and in the manner hereinafter set forth the market prices prevailing at the time of delivery for such logs, less the sum of $8.00 per 1000 feet, Standard Spaulding Scale. In the case of fir logs delivered by Lansing, the same shall be scaled by the Standard Spaulding Scale which shall be the basis of payment; redwood logs shall be scaled by the Humboldt Scale which shall be the basis of payment. (a) The parties stipulate that the sum of $8.00 per 1000 feet, Standard Spaulding Scale, being deducted from *259 the market price as aforesaid is the fair and reasonable value of the stumpage. * * *
(e) It is acknowledged and stipulated that the parties do not hereby intend to assign the rights, privileges and/or obligations of Speier under the said agreement between Speier and Travers and Travers, but simply to provide for the exclusive irrevocable logging of said property by Lansing. (f) That for so long as Lansing faithfully performs this agreement, Lansing shall have and enjoy all the rights, privileges and benefits which Speier is able to extend, grant or convey pursuant to said Travers agreements, including, but not limited to, the use of roads and rights of way and the right to log other and additional timber which Speier may hereafter obtain pursuant to the terms and provisions of said Travers agreements. * * *
(h) Speier warrants and represents that he has not heretofore assigned or conveyed any of his rights, privileges or benefits extended to Speier in the aforesaid Travers agreements. * * *
14. Speier agrees to sell and Lansing agrees to buy all that certain logging equipment mentioned in Schedule A, attached hereto, incorporated herein and made a part hereof, *260 for the total purchase price of $38,250.00. * * *
15. Speier agrees to sell and Lansing agrees to purchase that certain logging camp (G. L. Speier Co. Camp # 10) more particularly identified in Schedule B, attached hereto, incorporated herein, and made a part hereof, for the total purchase price of $26,290.00. * * *
16. Lansing agrees that he will, at his own proper cost and expense, maintain fire and comprehensive insurance upon the properties described in Schedules A and B, attached hereto, and hereinabove referred to in the foregoing Sections 14 and 15, in a sum not less than the unpaid balance of the purchase price. 17. Lansing agrees to log and deliver not less than 20,000,000 feet of logs per year from said properties, and further agrees to log and deliver a minimum of 1,000,000 feet of logs each and every month hereafter during the term of this agreement, except for the months of December, January, February and March should weather conditions during said months make it impossible to log and deliver said minimum amounts. The obligations of Lansing contained in this said section shall be suspended by fire, acts of God or other acts and things beyond the control *261 of Lansing, except usual winter weather conditions. 18. This agreement shall continue until November 1, 1960. 19. The provisions hereto and hereof shall inure and be binding upon the executors, administrators, heirs and assigns of the parties hereto. It is agreed, however, that Lansing may not assign this Agreement without the prior written consent of Speier, but Speier agrees that he will not unreasonably withhold such consent. On October 30, 1952, Speier and petitioner entered into an agreement, modifying the above August 19, 1952, agreement as follows: 1. It is agreed that anything in the referenced agreement to the contrary, Lansing may at any time sell and deliver peeler logs to such buyer as he may desire, provided that he can thereby obtain a better price than he could obtain from Arcata Plywood Company. During the year 1951 and prior to August 19, 1952, petitioner was in the general timber business. He bought and sold timber and also bought timber, logged the same, and sold the logs. Prior to entering into the August 19, 1952 agreement, petitioner owned some logging equipment of his own, consisting in part of two tractors, chain saws and pick-ups. He did not own *262 or operate any sawmills personally. G. L. Speier Co. was a corporation. Speier was its principal stockholder and president. Speier handled his Travers contracts through and for the use of the corporation. G. L. Speier Co. did not conduct any sawmill operations after December 1953. It did not purchase any logs from petitioner or from anyone else during the years 1954, 1955, 1956, or 1957. From July through December 1953 petitioner produced from the Travers tract 9,889,842 board feet of logs, 2,153,578 of which he delivered to G. L. Speier Co. and the balance to customers of his own choosing and selection and for his own account. From January 1954 through July 1955 petitioner produced from the Travers tract 17,321,451 board feet of logs, all of which he delivered to customers of his own choosing and selection and for his own account. Petitioner never cut the annual minimum of 20,000,000 feet required under the Travers contracts. However, he paid the minimum stumpage payments to Travers for the 20,000,000 feet even though he did not cut the minimum. In the latter part of 1953 Speier told petitioner that he did not need his right of first refusal any more and that petitioner *263 could sell to anyone he desired. Speier never directed petitioner to deliver logs to anyone after 1953. Petitioner continued in business for himself and sold to others than Speier after December 1953. The value of stumpage on the Travers tract in 1954 was about $15 per thousand feet. Petitioner was required to pay only $8 per thousand feet under his contract with Speier. Because of the increase in the value of stumpage the Travers became dissatisfied with their contracts with Speier and on or about November 28, 1952, they filed in the Superior Court of the State of California in and for the County of Humboldt a "Complaint For Decree Adjudging That Contract Has Been Terminated, For An Injunction And For Moneys Due And Owing Under Contract." On December 31, 1953, a Memorandum of Opinion was handed down by the Court and on February 23, 1954, the Court filed its judgment decreeing that plaintiffs recover judgment for three relatively small amounts and "That all other relief prayed for in plaintiffs' complaint be denied and that the permanent injunction prayed for by the plaintiffs be and the same is hereby denied." In the latter part of 1954 or early in 1955 the Travers assigned *264 their interests in the Speier contracts to Columbia Forest Products, Inc., a corporation. Between January 1954 and April 1954 Speier and petitioner had several discussions in which Speier stated that he wanted to relinquish all of his remaining rights to the agreement of August 19, 1952, for a fixed sum. Speier originally asked for $125,000. Finally, in April 1954, Speier and petitioner orally agreed that Speier would receive $100,000 from petitioner for all of Speier's rights in the Travers contracts. The $100,000 was to be paid out of logs cut by petitioner at the rate of $4 per thousand feet. Because of the trouble with the Travers, and the time for appeal in the suit filed by the Travers not having run, Speier did not want this oral agreement reduced to writing and, as a result, no record of the oral agreement was made on the books of G. L. Speier Co. until March 1955. At all times Speier treated the transactions between him and petitioner as sales of stumpage to petitioner and purchases of logs from petitioner. Speier recorded the transactions in the books of G. L. Speier Co. accordingly. On or about May 13, 1955, Columbia Forest Products, Inc., filed in the United States *265 District Court for the Northern District of California, Northern Division, a "Complaint To Terminate Contract, To Enjoin Cutting of Timber And For An Accounting" against Speier and petitioner. On or about April 12, 1956, the Court entered its judgment in the suit wherein it was ordered, adjudged and decreed that excepting for a certain stipulation of the parties "Plaintiff take nothing by this action and as to all such matters, the Defendants have judgment thereon." On March 28, 1956, petitioner entered into an agreement with three partners, doing business as Precision Lumber Company, hereinafter sometimes referred to as Precision. The written contract, insofar as it is material to this case, recited as follows: ASSIGNMENT OF AGREEMENT THIS AGREEMENT, Made this 28 day of March, 1956, by and between DEAN LANSING, of Arcata, Humboldt County, California, hereinafter referred to as LANSING, and ROBERT L. SPOO, ARTHUR W. SPOO and ORVILLE L. SNYDER, copartners doing business as PRECISION LUMBER COMPANY, hereinafter referred to as PRECISION, WITNESSETH: WHEREAS on or about the 18th day of February, 1951, RAYMOND E. TRAVERS and JUANITA F. TRAVERS, his wife, entered into a certain *266 agreement with G. L. SPEIER, an individual, for the sale by Travers to Speier of certain timber * * * more particularly described in said agreement; and WHERAS thereafter the said G. L. Speier entered into an agreement, being dated August 19, 1952, wherein the said LANSING acquired, among other things, the exclusive right to long said timber; and WHEREAS LANSING now desires to assign to PRECISION all of LANSING'S right, title and interest in and to the aforesaid agreement dated August 19, 1952 between LANSING and Speier, and the timber referred to therein; NOW, THEREFORE, IT IS AGREED as follows: 1. Upon the terms and conditions hereinafter expressed, LANSING agrees to sell, and does hereby sell, assign, transfer and convey to PRECISION the following: (a) All right, title and interest of LANSING in and to that certain agreement, dated August 19, 1952, between LANSING and G. L. SPEIER. (b) All of the right, title and interest, if any, of LANSING in and to that certain real property and the timber standing, lying or being thereon, more particularly described in that certain agreement, dated February 18, 1951, by and between RAYMOND E. TRAVERS and JUANITA F. TRAVERS, his wife, *267 and G. L. SPEIER. 2. PRECISION agrees to pay to LANSING for the aforesaid items, matters and things, a total sum of One Million, Nineteen Thousand, Seven Hundred Fifty Dollars ($1,019,750.00) in the manner set forth in the next following section (Section 3,) of this agreement. 3. Payment of the purchase price as set forth in Section 2 hereof shall be made as follows: (a) The sum of One Hundred Fifty Thousand Dollars ($150,000.00) upon the execution of this agreement, receipt whereof is herewith acknowledged by LANSING. (b) The additional sum of One Hundred Forty-five Thousand, Seven Hundred Twenty-seven and 50/100 Dollars ($145,727.50,) to be paid to LANSING by PRECISION during the year of 1956, in accordance with the terms and conditions of three certain promissory notes executed to the order of LANSING by PRECISION bearing even date herewith. (c) The balance of the purchase price, to-wit: the sum of Seven Hundred Twenty-four Thousand, Twenty-two and 50/100 Dollars ($724,022.50) shall be paid commencing January 1, 1957 and not before, at the rate of Twenty-five Dollars ($25.00) per thousand feet for all timber removed from the property by PRECISION or its contractors. *268 Gerald Harland acted as the attorney for Precision in negotiating the March 28, 1956 agreement with petitioner. Precision wanted to buy all of petitioner's rights to the Travers timber. Harland was of the professional opinion that Speier had no remaining rights left in the Travers timber, having in April 1954 sold those rights to petitioner for $100,000. Because of all of the litigation that had taken place, Harland, acting on behalf of Precision in an abundance of caution, insisted that Speier, on or immediately before March 28, 1956, execute three documents, the bodies of which are as follows: Document one (called Assignment): In consideration of the sum of One Dollar ($1.00) and other good and valuable considerations, the undersigned, G. L. SPEIER, assigns to DEAN LANSING all of the right, title and interest of G. L. SPEIER in and to that said Agreement, dated on or about February 18, 1951, between Raymond F. Travers and Juanita E. Travers, his wife, and the said G. L. SPEIER. Document two (no title): In consideration of the sum of One Dollar ($1.00) and other good and valuable considerations, the undersigned, G. L. SPEIER, hereby authorizes, instructs and directs DEAN *269 LANSING, his successor in interest, assignee or nominee, to deliver all logs developed in the logging of the so-called Travers property in the Bald Hills, Humboldt County, California, to Precision Lumber Company, a partnership, Bayside, California, or to Bay Lumber Co., a corporation, or to such other mills or purchasers as the said DEAN LANSING, his successor in interest, assignee or nominee may select. This instruction and direction is irrevocable until November 1, 1960. Document three (called Consent to Assignment): In consideration of the sum of One Dollar ($1.00) and other good and valuable considerations, the undersigned, G. L. SPEIER, does by these presents consent to the sale, conveyance, assignment and transfer by DEAN LANSING of all of the right, title and interest of the said DEAN LANSING in and to that certain Logging Agreement by and between the undersigned, G. L. SPEIER, and the said DEAN LANSING. As of March 22, 1956, petitioner was indebted to Speier in the sum of $126,014.30, consisting of $56,676.75 still owing Speier on the $100,000 oral contract, and other moneys which petitioner had borrowed from Speier. By memorandum of agreement dated March 22, 1956, between *270 Speier and petitioner concerning the indebtedness of $126,014.30 it was - agreed that upon payment of said sum Lansing will have then paid and discharged all obligations due to Speier from Lansing for any reason whatsoever, including all obligations due Speier from whatsoever, including all obligations due Speier from Lansing now or hereafter pursuant to the terms and provisions of that certain Agreement between the said G. L. Speier and Dean Lansing dated August 19, 1952. The actual assignment by Speier to petitioner of all of the right, title, and interest of Speier in and to the February 1951 agreement between the Travers and Speier was effective in April 1954 by reason of the oral agreement between Speier and petitioner entered into in April 1954 whereby Speier sold those rights to petitioner for $100,000. By reason of such oral agreement petitioner not only acquired a contract right to cut timber but also a right to sell the timber cut on his own account. During the taxable years 1955, 1956, and 1957 petitioner realized income from the Travers tract of $176,810.02, $176,512.50, and $183,620.80, respectively, which it reported as long-term capital gain. The respondent determined *271 that such income was ordinary income. Re: Section 33 Property On October 30, 1952, Speier was indebted personally to Marie Lansing, the mother of petitioner. On that date Speier executed and delivered to Marie a deed covering a one-half interest in Section 33 for the indebtedness. Commencing with the fiscal year July 1, 1952, and terminating on or about April 30, 1955, petitioner and his mother were equal general partners in a business conducted under the name of Dean Lansing. Marie contributed here interest in the Section 33 property to the partnership after which the property was held by the partnership. The partnership was dissolved effective April 30, 1955. On October 30, 1952, Speier and his wife Lois M. Speier and Marie Lansing, as first parties, entered into a logging agreement with petitioner relating to Section 33. The agreement provided in part: WHERAS, the First Parties are the owners of the merchantable timber located upon the East half of Section 33 in Township 10 North of Range 3 East, Humboldt Meridian; and WHEREAS, the parties hereto desire by this agreement to provide for the logging of the same by Second Party; IT IS HEREBY AGREED as follows: 1. First *272 Parties hereby give and grant to Second Party the exclusive right to enter upon the aforesaid premises and to remove therefrom all merchantable timber thereon, excepting hardwoods. Second Party agrees to commence the logging of the same within a reasonable period of time and to continue his operation thereon regularly during the coming winter season, it being agreed that said property is a winter show and is to be logged during the winter months only. 2. Second Party agrees to sell and deliver all sawlogs thereby developed to G. L. Speier Co., Arcata, California, at the prevailing market price, less the sum of $3.75 per M feet. In this regard, the parties agree that said stumpage shall be computed at the rate of $7.50 per M feet and the aforesaid $3.75 per M feet represents payment to G. L. Speier for his one-half (1/2) interest therein. During the taxable years here involved petitioner was the principal stockholder of Coast Timber Co., a California corporation. On April 28, 1955, Coast Timber Co. as buyer and Dean Lansing and Marie Lansing as sellers entered into an agreement providing in part as follows: WHEREAS the Sellers herein have been conducting business as copartners *273 under the name and style of DEAN LANSING, and WHERAS the said copartnership has acquired certain logging machinery and equipment, the same being subject to certain encumbrances and liabilities, more particularly hereinafter referred to, and WHERAS the said Sellers herein intend to dissolve the said copartnership for all purposes, effective April 30, 1955, and WHERAS the said Sellers herein desire to sell said logging machinery and equipment and Buyer herein desires to purchase the same, NOW, THEREFORE, IT IS AGREED as follows: 1. Sellers agree to sell all of the said logging machinery and equipment heretofore employed and used by the Sellers, or either of them, in connection with that certain logging venture operated by the Sellers under the name and style of DEAN LANSING. * * * During the taxable years 1956 and 1957 petitioner realized income from the Section 33 property of $8,952 and $3,642.57, respectively, which it reported as long-term capital gain. The respondent determined that such income was ordinary income. Re: Wilson Tract Pacific Logging Co. is a partnership composed of petitioner and Keith Lansing (petitioner's brother) with petitioner owning a 95 percent *274 interest and Keith a 5 percent interest. Federal partnership returns of income were filed by Pacific Logging Co. for the period May 1, 1955, to November 30, 1955, and for the fiscal years ending November 30, 1956, 1957, and 1958, with the district director of internal revenue at San Francisco, California. On May 28, 1952, Myrtle L. Wilson and her husband Albert Wilson executed a deed to Marie D. Lansing to Lot 2, Section 3, Township 12 North of Range 2 East Humboldt Meridian, containing 40 acres more or less. On November 30, 1954, Marie D. Lansing deeded the same property to Keith B. Lansing, and Janice Lansing, his wife, as joint tenants. On May 21, 1955, Keith and Janice deeded the same property to Table Timber Co., a corporation. Petitioners on their joint return for 1955 reported a long-term capital gain of $8,389.80 from the sale of Wilson Timber Tract computed as follows: Date acquired
June 10, 1952
Date sold
June 3, 1955
Sales price
$12,000.00
Deduct: Cost
$3,500.00
Expense of sale
110.20
3,610.20
Gain
$ 8,389.80
The respondent determined that the gain of $8,389.80 was ordinary income. Opinion During the taxable years 1955, 1956, *275 and 1957 petitioners received income from the Travers timber tract of $176,810.02, $176,512.50 and $183,620.80, respectively. Petitioners contend that they are entitled to the benefits of section 631(a) [1] of the Internal Revenue Code of 1954 in that they had held a contract right to cut timber on the Travers tract for a period of more than 6 months before the beginning of each taxable year; that the cutting of such timber "shall be considered as a sale or exchange"; and that being a sale or exchange of assets held for more than 6 months, the gain was long-term capital gain under subchapter P, only 50 percent of which was taxable. Respondent contends that petitioners are not entitled to the benefits of section 631(a) and that all of the income in question is taxable as ordinary income. *276 Section 631(a), supra, is the successor to section 117(k)(1), of the Internal Revenue Code of 1939. Section 1.631-1(b)(1) of the Income Tax Regulations provides that: In order to have a "contract right to cut timber" within the meaning of section 631(a) and this section, a taxpayer must have a right to sell the timber cut under the contract on his own account or to use such cut timber in his trade or business. Counsel for respondent concedes in his opening statement that if petitioners "had an unlimited right to sell the logs that were cut from the timber" on the Travers tract, then petitioners would come within the provisions of section 631(a), provided they held such right for the required period of more than 6 months. Respondent contends, however, that under the contract of August 19, 1952, petitioner Dean Lansing [2] did not have the right to sell the timber cut under the contract on his own account but was required to deliver it "to G. L. Speier Co., a corporation, or to such other locations * * * as Speier may from time to time direct." (Agreement of Aug. 19, 1952, par. 2.) In other words, respondent contends that petitioner was hired to cut the *277 timber for Speier and that petitioner's income derived therefrom was in the nature of compensation for services rendered. The litigated cases under section 117(k)(1) and/or section 631(a) turn on whether the taxpayer there involved held a mere personal service logging contract or whether the taxpayer held a right to cut the timber and to sell the timber on his own account. Two of the cases taking the former view are Helga Carlen, 20 T.C. 573, affd. 220 F. 2d 338 (C.A. 9, 1955), and Ellison v. Frank, 245 F. 2d 837 (C.A. 9, 1957). Four cases holding for the taxpayer are Kolney L. Pinkerton, 28 T.C. 910; United States v. Johnson, 257 F. 2d 530 (C.A. 9, 1958); Gilmore v. United States, 180 F. Supp. 354 (Ct. Cl. 1960); and Wirklola v. United States, 181 F. Supp. 338 (W.D. Wash. S.D. 1960). Petitioner contends that notwithstanding such *278 provisions as are contained in paragraphs 2 and 10(e) of the written agreement of August 19, 1952, such agreement, together with the other written agreements of October 30, 1952, and March 22, 1956, when considered in their entireties, support his contention that he had contractual cutting rights to the Travers timber and that he sold the cut logs for his own account; and that irrespective of the said written agreements, the conduct of petitioner and Speier beginning in 1953 and culminating in the oral agreement of April 1954 between petitioner and Speier whereby it was agreed that petitioner would pay Speier a lump sum of $100,000 for all of Speier's rights in the Travers contracts to be paid as the timber was cut, clearly support his contention as stated above. Respondent looks only at the written agreements and argues that under such agreements the case is controlled by Helga Carlen, supra. He further argues that the evidence does not support a finding that petitioner and Speier entered into the alleged oral agreement of April 1954; that Speier did not relinquish his rights under the agreements with the Travers until March 28, 1956, when he executed the three short *279 documents, the bodies of which are set out in our findings; and that, therefore, the "contract right" referred to in section 631(a), supra, was not held by petitioner for the required period of "more than 6 months," since petitioner on that very day, March 28, 1956, sold all of his rights in the Travers timber to Precision. We find it unnecessary to decide whether the written agreements between petitioner and Speier alone support petitioner, for the reason that it is our opinion, contrary to what respondent has argued, that petitioner and Speier did enter into the alleged oral agreement of April 1954, and we have found as a fact that the alleged oral agreement was entered into and fully executed. Respondent, in support of his contention that the evidence does not support such a finding, strongly urges that since no mention of the alleged oral agreement was made in the agreement between Speier and Precision on March 28, 1956, or in the three short documents executed by Speier as of that date, we must find that Speier did not transfer or release his delivery rights until March 1956. We do not agree. We think the evidence overwhelmingly supports petitioner that the oral agreement *280 was made as has been found. The probability of such an agreement is consistent with many things that happened in 1953. Petitioner was in business for himself. He owned his own equipment. Speier told petitioner he could sell to anyone he desired and could cut as much timber as he wanted. Speier never directed petitioner to deliver logs to anyone after 1953. Speier took no logs from petitioner after 1953. At no time did Speier ever take petitioner's entire output. Petitioner sold all logs not taken by Speier to others of his own choosing for his own account. G. L. Speier Co. did not conduct any sawmill operations after December 1953. Petitioner, Harland, and Elmo Goontz, the bookkeeper for G. L. Speier Co., all unequivocally testified that the oral agreement was entered into. Petitioner and Harland definitely fixed the date as being during April 1954. Speier was deceased at the time of the trial. The agreement was not reduced to writing and was not recorded on the books until almost a year later due to the various lawsuits that were going on at the time. We have carefully considered all of the evidence and are satisfied that during April 1954 petitioner and Speier entered into the *281 oral contract set out in our findings and that after that date petitioner had the right cut and sell the Travers timber on his own account. We hold that petitioners are entitled to the benefits of section 631(a), supra, and that the income from the Travers timber tract referred to at the beginning of this opinion is taxable as long-term capital gain. Volney L. Pinkerton; United States v. Johnson; Gilmore v. United States; Wirkkala v. United States, all supra. Re: Section 33 Property As to this property petitioner must lose by reason of failure of proof. Petitioner has shown that on October 30, 1952, Speier deeded Marie Lansing a one-half interest in Section 33; that on the same date Speier and his wife and Marie, as first parties, entered into a "Logging Agreement" with petitioner, as second party; that commencing with the fiscal year July 1, 1952, petitioner and Marie (petitioner's mother) entered into a partnership called "Dean Lansing"; that Marie contributed her one-half interest in Section 33 to the partnership; and that the partnership was dissolved, effective April 30, 1955. The evidence does not show what happened to the one-half interest in Section 33 upon the dissolution *282 of the partnership. Petitioners contend that under the agreement dated April 28, 1955, this one-half interest was sold to Coast Timber Co., a corporation owned principally by petitioner. But this agreement was for the sale by the partnership of only the "logging machinery and equipment." It made no reference to the one-half interest in Section 33. Petitioner in support of his contention that the partnership sold the one-half interest to Coast Timber Co. cites his testimony on direct examination which is in part as follows: By Mr. Hindin: Q. Now, then, thereafter did you acquire your mother's interest in the partnership? A. Well, the partnership, when it was dissolved, both parties sold to Coast Timber Company, which was a corporation which I own. Q. And then thereafter Coast acquired your mother's and your interest in the partnership, is that right? A. That is true, yes. THE COURT: Well, now, technically, that may not be true. Mr. Hindin: Well, that is what I - THE COURT: I don't know whether she sold the partnership interest, or whether she sold the property owned by the partnership. Which was it, do you know? THE WITNESS: It was the property I believe. Mr. Hindin: *283 Yes. It is Exhibit 16 [agreement dated April 28, 1955], which has been stipulated to, I believe covers the transaction. I wonder if I might ask you, to refresh your recollection, sir. THE COURT: Otherwise, you would have the corporation becoming the partner. Mr. Hindin: That I don't believe occurred. THE COURT: I don't think so either. THE WITNESS: Yes. I recognize this. By Mr. Hindin: Q. Does that truly set forth the overall terms of your agreement? A. Yes. Mr. Hindin: All right, Your Honor, then, Exhibit 16 completes the picture, as far as Section 33 is concerned. The particular part of the above testimony specifically relied upon by petitioner is the second question and answer. But when the balance of the testimony is considered it is plain that only the logging machinery and equipment were sold by the partnership to Coast Timber Co. But even if petitioner and his mother had sold Section 33 to the Coast Timber Co. that would not help petitioner any unless he entered into some agreement with Coast Timber Co. Petitioner and the Coast Timber Co. are separate legal entities even though petitioner may own all the stock of that company. Petitioner's opening brief *284 on this issue closes as follows: It is respectfully submitted that the Petitioner is entitled to the capital gain treatment which he reported and elected to take as shown on his tax returns for the year ended December 31, 1955. There is no issue in this case on the Section 33 property for the calendar year 1955. For that year petitioner reported as "ordinary income" his one-half of $5,707.94 as "logging operations" from the Dean Lansing partnership shown in its final return for the fiscal year ended April 30, 1955, and also as "long-term capital gain" his one-half of $23,642.70 as the gain from the sale of the logging machinery and equipment to Coast Timber Co. These items of income were not disturbed by the respondent. The only issue in this case on the Section 33 property is income for the years 1956 and 1957 of $8,952 and $3,642.57, respectively, which petitioner reported as long-term capital gain and respondent determined was ordinary income. As to this issue we hold petitioner has not shown error on the part of the respondent. Re: Wilson Tract The handling of this issue by both parties has been unsatisfactory. It is apparent from the deficiency notice that the respondent *285 at the time he made his determination misconceived the Wilson transaction. As set out in our findings, petitioner simply reported a long-term capital gain of $8,389.80 from the sale of a tract of timber called the Wilson tract. On the basis of the facts set out in the return as to the date of acquisition and the date of sale, petitioner would be correct in so reporting the gain as a long-term capital gain. Respondent in his determination for the calendar year 1955 apparently conceded there was a gain of $8,389.80 to be reported but considered this gain in the same category as the gain of $176,810.02, supra, from the Travers tract, i.e., a gain from cutting timber. He increased petitioners' income by "(a) Business Income $185,199.82" and decreased petitioners' income by "(d) Capital gains $92,599.91" with the following explanations: (a) It is determined that the provisions of the agreements made in connection with the so-called Travers timber, which provides for logging and is subject to sales restrictions, and the Wilson timber, which is owned by Marie Lansing, do not qualify under Section 631(a) of the Internal Revenue Code for an election to consider the *286 cutting of timber as a sale or exchange. Income is increased $185,199.82 representing the inclusion of the gain realized on the sale of the timber since it is held to be taxable as ordinary income rather than as long-term gain from the sale or exchange of capital assets as reported on your income tax return as follows: Wilson Timber tract
$ 8,389.80
Travers contract
176,810.02
Increase to income
$185,199.82
* * *
(d) Income is decreased $92,599.91 to eliminate the 50 percent capital gain reported as a result of the sale or exchange of cutting of timber as explained in adjustment (a). There was no "cutting of timber" by petitioner on the Wilson tract. It was a sale of the tract. The pleadings did not clarify the matter. The facts were stipulated. The stipulated facts were that on May 28, 1952, the Wilsons sold the property to Marie Lansing; that on November 30, 1954, Marie deeded the property to Keith and his wife; that on May 21, 1955, Keith and his wife sold the property to the Table Timber Co., a corporation; and that from May 1, 1955, through the years here involved Keith and petitioner were partners doing business as Pacific Logging Co., with petitioner *287 having a 95 percent interest and Keith a 5 percent interest. There is no evidence that either Marie or Keith ever contributed their interest in the Wilson tract to the Dean Lansing partnership or to the Pacific Logging Co. partnership. In other words, in the chain of title which has been stipulated, there is no evidence, as such, that petitioner ever owned an interest in the Wilson tract. However, petitioners, in their joint return for 1955, did report a long-term capital gain of $8,389.80 from the sale of the tract and they still contend that were right in doing so. Certainly, on the basis of the record, we cannot sustain the respondent's determination. After carefully considering the matter, we have decided to leave it as petitioners reported it on their return. Decision will be entered under Rule 50. Footnotes
1. SEC. 631. GAIN OR LOSS IN THE CASE OF TIMBER OR COAL. (a) Election to Consider Cutting as Sale or Exchange. - If the taxpayer so elects on his return for a taxable year, the cutting of timber (for sale or for use in the taxpayer's trade or business) during such year by the taxpayer who owns, or has a contract right to cut, such timber (providing he has owned such timber or has held such contract right for a period of more than 6 months before the beginning of such year) shall be considered as a sale or exchange of such timber cut during such year. * * * If a taxpayer makes an election under this subsection, such election shall apply with respect to all timber which is owned by the taxpayer or which the taxpayer has a contract right to cut and shall be binding on the taxpayer for the taxable year for which the election is made and for all subsequent years * * *.↩
2. Hereafter, we shall sometimes refer to Dean Lansing as the petitioner as he is the one who entered into all the contracts and petitioner Virginia L. Barba is a petitioner only by reason of having filed joint returns with her then husband, Dean Lansing.↩